# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re:  Ingrid L. Vega, d/b/a Professional : 
Interpreters of Erie, : 
                      Petitioner : 
                       : 
               v. :   No. 1787 C.D. 2019
                       :   Argued:  October 13, 2020
Commonwealth of Pennsylvania, : 
Department of Labor and Industry, : 
Office of Unemployment Compensation : 
Tax Services, : 
                  Respondent : 


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE J. ANDREW CROMPTON, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**          **FILED:  November 12, 2020**

Ingrid L. Vega, d/b/a Professional Interpreters of Erie (Petitioner), petitions for review of a December 6, 2019 Final Decision and Order (Final Decision) of the Department of Labor and Industry (Department), which denied Petitioner's Petition for Reassessment (Petition) and affirmed the unemployment compensation (UC) tax contributions assessed by the Department's Office of UC Tax Services (OUCTS). Petitioner provides interpretation, translation, and transcription services to entities, including medical facilities and providers.  Before this Court, Petitioner argues that the Department erred in determining that Petitioner did not meet its burden of

showing that 95 individuals who worked as interpreters and office staff[1] were independent contractors and not employees. Upon review of the record, we affirm the Department's Final Decision because Petitioner did not meet its burden to show that the interpreters and office staff were independent contractors.

## I.    BACKGROUND

### A. *The Audit and Subsequent Proceedings*

On July 28, 2017, the Department, through OUCTS, audited Petitioner and determined that 95 interpreters and office staff were "misclassified as independent contractors instead of employees" from the first quarter of 2013 through the first quarter of 2017. (Final Decision, Findings of Fact (FOF) ¶¶ 17, 87.) During the audit, OUCTS reviewed the following: "Petitioner's tax records, including returns and Form 1099s[;] business records[;] banking records[;] . . . [and] responses to questionnaires sent by OUCTS to [any interpreters or office staff] who received the IRS Form 1099s"; Petitioner's agreements with its interpreters and office staff labeled as "Independent Contractor Agreements" (Agreements); other documents between Petitioner and the interpreters and office staff, including documents labeled "Interpreter Evaluation Form" and "Support Desk Duties and Responsibilities"; and Petitioner's webpage. (*Id*. ¶¶ 19-20, 71.)

Based upon the audit, OUCTS issued five Notices of Assessment (Assessments) for that time period.[2] (Final Decision at 1-2.) Thereafter, Petitioner filed the Petition, challenging the Assessments. A hearing was held on October 16

---

[1] In Petitioner's Brief, Petitioner acknowledges that "the vast majority of individuals in question are interpreters." (Petitioner's Brief at 5.)

[2] Petitioner was assessed the following amounts, including the UC tax contributions, interest, and penalties: $2873.49 for the year 2013; $4374.35 for the year 2014; $9112.72 for the year 2015; $8210.22 for the year 2016; and $3557.21 for the first quarter of 2017.

and 17, 2018. OUCTS introduced a number of exhibits reviewed as part of the audit and called as witnesses a UC Tax Agent[3] and a UC Tax Supervisor,[4] who testified about the audit process, and Petitioner's former Chief Marketing Officer,[5] who testified as follows. Chief Marketing Officer was responsible for hiring/recruiting, marketing/public relations, and maintaining contracts. New interpreters go through testing and training and complete a variety of paperwork as part of the hiring process, including a non-compete agreement. The interpreters and office staff also had policies and procedures to which they had to adhere. Petitioner would withhold pay or place an interpreter on probation if an interpreter did not follow the procedures set out, such as wearing name badges on an assignment and providing written notice when the interpreter was unable to provide services. The interpreters were scheduled to provide interpreting services through Petitioner, although some of the interpreters did obtain their own clients, but were still paid through Petitioner, who paid the interpreters based upon time sheets they completed. On cross-examination, Chief Marketing Officer acknowledged she was involved in a dispute with Petitioner over money allegedly owed to Chief Marketing Officer. She also acknowledged the interpreters were told at the time of hire they were independent contractors. When asked for specifics about discipline, Chief Marketing Officer could not provide any details, such as the names of any of the interpreters who were disciplined.

Ms. Vega, Petitioner's sole proprietor, testified on the second day of the hearing, as follows.[6] The interpreters are not involved in the insurance billing

---

[3] UC Tax Agent's testimony appears on pages 1361a through 1419a of the Reproduced Record.

[4] UC Tax Supervisor's testimony appears on pages 1421a through 1428a of the Reproduced Record.

[5] Chief Marketing Officer's testimony appears on pages 1216a through 1256a of the Reproduced Record.

[6] Ms. Vega's testimony appears on pages 1470a through 1591a of the Reproduced Record.

3

process, which Petitioner handles. Petitioner bills the providers and then pays the interpreters. Approximately 98% to 99% of medical facilities contract only with agencies, such as Petitioner, and refuse to contract directly with the interpreters. Contrary to Chief Marketing Officer's testimony, Ms. Vega claimed the interpreters were not trained by Petitioner. The website's references to training were an effort "to gain business" and "compete" with larger agencies. (R.R. at 1476a-77a.) Ms. Vega downloaded various forms from the internet, which she then customized and included in Petitioner's Agreements with the interpreters. Although there is an evaluation form, she rarely used it. Even though the interpreters sign a non-compete agreement upon hiring, Ms. Vega testified that the interpreters are free to work for other agencies. According to Ms. Vega, the intent of the non-compete agreement is not to prohibit the interpreters from working elsewhere, but to ensure any follow-up appointments that result from clients are maintained by Petitioner. The interpreters have always been viewed as independent contractors, which is common in the industry. In fact, the Agreement they sign with Petitioner expressly provides they are independent contractors. The interpreters are not supervised, reimbursed for their expenses, or provided benefits, training, equipment, or name badges. An interpreter can refuse work at any time. Petitioner never docked anyone's pay, although there was a time that an interpreter was reprimanded after Petitioner received complaints about the interpreter. Petitioner is notified when a client needs services, and then contacts the interpreters to check their availability. The interpreters also have their own clients, and "nine times out of ten," appointments come directly from the interpreters. (*Id.* at 1499a.) Often, Petitioner does not know of the interpreters' appointments until they submit the paperwork. Ms. Vega claims Chief Marketing Officer did not depart Petitioner on good terms.

4

In addition to Ms. Vega, three interpreters testified on Petitioner's behalf. The interpreters testified that they considered themselves independent contractors because they were free to quit, set their own schedule, and turn down work. In addition, the interpreters testified they paid their own taxes, received no training, name badge, benefits, or reimbursement for expenses from Petitioner, and provided their own supplies and equipment. The interpreters also testified they were free to work for other agencies. One of the interpreters testified that if a client contacted her directly, the interpreter would bring the client to Petitioner and would notify Petitioner of follow-up appointments in advance. However, two of the interpreters testified that they did not let Petitioner know about follow-up appointments in advance. Instead, the follow-up appointments were reflected on their time sheets provided to Petitioner after the fact.

### B. The Department's Final Decision and Order

Upon consideration of the evidence and the parties' briefs, the Department denied the Petition and affirmed the Assessments. In doing so, the Department made the following relevant findings of fact. Ms. Vega issued multiple memoranda to address procedures for the interpreters and office staff. A memorandum addressing follow-up appointments was sent to the interpreters, reminding them to notify Petitioner within one week of any follow-up appointments that are scheduled. (FOF ¶¶ 2-3.) A separate memorandum was sent reminding the interpreters of various policies, including: wearing a name badge at all times during working hours; not disseminating personal contact information and instead providing only their agency business cards to clients and facilities for communication purposes; arriving 15 minutes early to an appointment unless told otherwise or risk having pay deducted

for each minute they are late; submitting all requests for time off in writing with two weeks' notice; refraining from "shift-switching" with other interpreters; and following procedures for the paperwork required to be paid for the assignments completed. (*Id.* ¶¶ 4-8, 10-11.) Furthermore, Petitioner's assignment sheet given to the facilities included Petitioner's logo and information, as well as a question as to whether the interpreter assigned was wearing his or her name badge. (*Id.* ¶ 12.)

The Department further found that every one of the 95 interpreters and office staff, who OUCTS deemed as being misclassified, was required to sign and execute an Agreement with a "Non-Compete Agreement" and "Exclusivity" clause. Although there were multiple versions of the non-compete agreements and exclusivity clauses introduced, the Department found they utilized the same or similar language. (*See id.* ¶¶ 21, 36-37, 44, 47, 56, 63-64.) As an example, one Agreement included the following language:

> **NON-COMPETE AGREEMENT.** Independent Contractor will not engage in competition, solicit or accept business from agencies services (sic) by [Petitioner] while under this agreement. For a period of 90 days after the termination of this Agreement, Independent Contractor will not directly or indirectly engage in any business that competes with [Petitioner in specified geographical areas]. . . . Independent Contractor agrees that this non-compete provision will not adversely affect the livelihood of Independent Contractor. Contractor agrees to sign a separate Non-Compete Agreement that will limit Contractors' (sic) ability to contract directly with any [of Petitioner's] Clients for a period of 2 years after the termination of this [A]greement.

(*Id.* ¶ 23.) A later Non-Compete Agreement also stated that "no contact is to be conducted with clients except thru [sic] [Petitioner's] scheduling department." (*Id.* ¶ 57.) Another Agreement signed by an interpreter in 2014 stated that "for a period of two (2) years commencing on the effective date of termination of employment with" Petitioner, the interpreter will not solicit business from Petitioner's customers.

(*Id.* ¶ 33.) It also referenced an "existing **contract of employment** between" Petitioner and the interpreter. (*Id.* ¶ 34 (emphasis in original).) An Exclusivity Clause utilized by Petitioner stated that "[w]hile under contract with [Petitioner], the Independent Contractor will not provide language services to another interpreting agency at any facility serviced by [Petitioner]." (*Id.* ¶ 24.) Petitioner also required the interpreters to sign an "Interpreters' Code of Ethics," which included Petitioner's letterhead. (*Id.* ¶ 13.) The interviews with interpreter candidates covered training, and informed the interpreters they would not be reimbursed. (*Id.* ¶ 73.) Furthermore, Petitioner advertised this training on Petitioner's website:

> Interpreters are trained on topics such as interpretation modalities, patient confidentiality and [the Health Insurance Portability and Accountability Act of 1996 (HIPAA)],[7] professionalism, cultural awareness, and medical terminology, among others. In addition to this training, newly hired interpreters complete a minimum of 30 hours of hands-on training . . . . All new hires undergo a final performance evaluation in the field before being sent out alone.

(*Id.* ¶ 72 (emphasis omitted).)

Based upon assignment sheets submitted by the interpreters, Petitioner bills for the interpreters' services. (*Id.* ¶ 75.) The Department found "[v]irtually all (98-99%) of medical facilities refuse to contract directly with individual interpreters" because healthcare providers prefer a single invoice and otherwise the interpreters would have a hard time getting paid. (*Id.* ¶¶ 75-78.) The healthcare providers directly contact Petitioner when in need of an interpreter, who then will accept the assignment and communicate to the interpreters to learn who will be available. (*Id.* ¶¶ 79-80.) Interpreters also bring Petitioner business from their communities, but will contract with another agency if a person from their community requests services

---

[7] 42 U.S.C. §§ 300gg, 1320d; and 29 U.S.C. §§ 1181-1183.

with a healthcare provider who is not Petitioner's client. (*Id.* ¶¶ 82-83.) The Department further found that Petitioner determined the rate of pay for the interpreters and office staff. (*Id.* ¶ 86.)

The Department found OUCTS met its initial burden of showing Petitioner paid interpreters and office staff remuneration, thereby creating a presumption of an employment relationship and shifting the burden to Petitioner to show otherwise. (Final Decision at 19.) Based upon the above findings, the Department concluded Petitioner maintained control over the interpreters and office staff. (*Id.* at 21-22.) The Department stated that the training advertised on the website shows that Petitioner was holding its interpreters out as being employees, and any attempt by Petitioner to state that training did not happen was to "minimize[] the presence or meaning of the words in Petitioner's interview sheets." (*Id*. at 22.) In regards to the name badges, Ms. Vega testified that Petitioner did not issue name badges, but the Department stated that there was correspondence in the record to remind an interpreter to turn in all materials belonging to Petitioner, including the interpreter's name badge. (*Id*.) In addition, although Ms. Vega testified Petitioner did not enforce penalties for violating policies, the Department explained "it is the right to enforce that is determinative." (*Id.*)

The Department continued that "[r]egardless of whether the [interpreters and office staff] considered themselves to be independent contractors, Petitioner clearly considered them as employees, by virtue of the agreements and supplemental agreements Petitioner required them to sign." (*Id.* at 23.) Further, while Ms. Vega and two interpreters testified that most interpreters did not notify Petitioner of follow-up appointments, the Department found this testimony was contradicted by another interpreter's testimony, as well as by memoranda Petitioner provided to the

interpreters. (*Id.*) Viewing the totality of the evidence, the Department concluded Petitioner did not satisfy its burden of showing the interpreters and office staff "were free from its control or direction in the performance of their work, and therefore ha[d] failed to rebut the presumption of employment." (*Id.* at 24.)

In addition, the Department concluded Petitioner did not show the interpreters and office staff were customarily engaged in an independent trade, occupation, profession, or business, the second prong of rebutting the employment presumption. The Department reasoned that "[t]he evidence shows significant restrictions on" the interpreters' and office staff's ability to work for others. (*Id.* at 25.) The Department also concluded that the interpreters and office staff were dependent upon Petitioner for continuing work. (*Id.* at 27.) Finally, the Department concluded that, despite the testimony of the three interpreters, the interpreters were not free to refuse assignments based upon the Agreements and Petitioner's procedures, as set forth in the memoranda.

Accordingly, the Department concluded that Petitioner did not meet its burden to rebut the presumption of employment and prove that the interpreters and office staff were independent contractors. (*Id.* at 28.) Petitioner now petitions for review of the Department's Final Decision.[8]

## II. PARTIES' ARGUMENTS

On appeal to this Court, Petitioner argues that the Department erred in determining that Petitioner did not meet its burden of proving that the interpreters

---

[8] "This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence." *Weaver Hauling & Excavating, LLC v. Dep't of Labor & Indus., Office of Unemployment Comp. Tax Servs.*, 132 A.3d 557, 566 n.3 (Pa. Cmwlth. 2016).

and office staff were independent contractors and not employees.[9] Petitioner cites testimony provided at the hearing to assert that the Department erroneously focused on the "non[-]compete provisions and confidentiality provision." (Petitioner's Brief (Br.) at 29-30.) Petitioner argues this is contrary to *SkyHawke Technologies LLC v. Unemployment Compensation Board of Review*, wherein we noted that "[b]ecause non-compete agreements are disfavored in Pennsylvania, and generally are unenforceable, we are particularly loathe to hold that the mere existence of such an agreement places the parties involved in an employer-employee relationship as a matter of law." 27 A.3d 1050, 1055-56 (Pa. Cmwlth. 2011) (internal citation omitted) (alteration in original). Furthermore, Petitioner argues that a totality of the circumstances should be considered as established in *Danielle Viktor, Ltd. v. Department of Labor and Industry, Bureau of Employer Tax Operations*, 892 A.2d 781, 801 (Pa. 2006). Additionally, Petitioner claims "the overriding issue is that the interpreters are free to accept or decline [] work." (Petitioner's Br. at 30.) Petitioner cites a number of cases which it argues are analogous to this matter. For instance, Petitioner asserts that this case is similar to *Viktor*, 892 A.2d at 791-92, in that the individuals did not consider themselves employees and there was no direct supervision over their work. (Petitioner's Br. at 31.) Also, Petitioner argues that *Beacon Flag Car Company, Inc. (Doris Weyant) v. Unemployment Compensation Board of Review*, 910 A.2d 103, 108 (Pa. Cmwlth. 2006), is instructive because the employer assigned and contacted the drivers, unlike the case before us in which contacts were established through the interpreters. (Petitioner's Br. at 31.) Petitioner also asserts that, like *Tobey-Karg Sales Agency, Inc. v. Pennsylvania*

---

[9] Petitioner sets out three arguments before this Court, all of which broadly argue that the Department erred in its legal conclusion that the individuals at issue were employees and not independent contractors. For ease of discussion, we have combined the three arguments.

*Department of Labor and Industry*, 34 A.3d 899, 908 (Pa. Cmwlth. 2011), the interpreters also possess financial risk if they do not work and the Agreements held Petitioner harmless from any mistakes. (Petitioner's Br. at 31.) Lastly, Petitioner cites *A Special Touch v. Department of Labor and Industry, Office of Unemployment Compensation Tax Services*, 228 A.3d 489 (Pa. 2020), to argue that the interpreters may do work for other agencies and other individuals, and thus are independent contractors like the beauty salon's workers in that case. (Petitioner's Br. at 31.) Petitioner argues that "the individuals here did not consider themselves to be employees," there was "no direct supervision over the provision of the work," the interpreters were only paid if they worked, and the interpreters were "free to work for other agencies and other individuals." (*Id*.) Therefore, Petitioner argues that the Department erred in finding that Petitioner did not meet its burden to show the individuals were independent contractors and not employees. (*Id*. at 32.)

The Department responds that Petitioner did not meet its heavy burden to prove that the interpreters and office staff were independent contractors under Section 4(*l*)(2)(B) of the UC Law, 43 P.S. § 753(*l*)(2)(B).[10] The Department asserts that Petitioner did not meet both prongs of Section 4(*l*)(2)(B) requiring that Petitioner prove that: it did not possess control over the interpreters and office staff; and the interpreters and office staff were customarily engaged in an independent trade, occupation, profession, or business. The Department argues that there was "ample evidence of direction and control by Petitioner over [the interpreters and office staff] in the significant aspects of their business relationship" and that "numerous factors revealed in the record" show that Petitioner did not meet the requirement that the interpreters and office staff be "free from direction and control."

---

[10] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 753(*l*)(2)(B).

(Department's Br. at 14-15.)  Furthermore, the Department asserts that the record supports the conclusion that the interpreters were not customarily engaged in their own independently established business so as to meet the requirement of Section 4(*l*)(2)(B) of the UC Law.  (*Id*. at 15.)  The Department argues that the interpreters and office staff were limited in how and for whom they worked, the interpreters depended on Petitioner to work with healthcare providers, and the interpreters could not refuse an assignment according to Petitioner's policies.  (*Id*. at 15-19.)  Therefore, the Department asserts that Petitioner did not meet its burden to prove that the interpreters were not customarily engaged in the business or profession.

## III.  DISCUSSION

An individual who performs services for wages is presumed to be an employee for purposes of unemployment compensation taxes.  *A Special Touch*, 228 A.3d at 503.  Section 4(*l*)(2)(B) of the UC Law states, in relevant part, that:

> [s]ervices performed by an individual for wages shall be **deemed to be employment** subject to this act, **unless and until** it is shown to the satisfaction of the [D]epartment that--(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(*l*)(2)(B) (emphasis added).  Thus, after the Department makes a showing that an individual has performed services for wages, employment is presumed.  *Weaver Hauling & Excavating, LLC v. Dep't of Labor & Indus., Office of Unemployment Comp. Tax Servs.*, 132 A.3d 557, 573 (Pa. Cmwlth. 2016).  The burden then shifts to a putative employer to rebut this presumption by satisfying the two-prong test set forth in Section 4(*l*)(2)(B) by showing that (1) an individual is

free from an employer's control or direction, and (2) an individual is customarily engaged in an independently established trade, occupation, profession, or business. *Weaver Hauling*, 132 A.3d at 573. Both of these showings must be made, or the presumption that the individual is an employee stands. *Id*.

In the case before us, OUCTS satisfied its initial burden to show that services were performed for remuneration by demonstrating that the interpreters and office staff were paid wages for services they performed. (Final Decision at 19.) This fact is not in dispute before this Court, and so there is a presumption of employment, which Petitioner must rebut.

In this case, Petitioner challenges the Department's Final Decision that the 95 individuals who are either interpreters or office staff were misclassified as independent contractors instead of employees. Before the Department, Petitioner presented evidence only as to its interpreters, three of whom testified for Petitioner, in addition to Ms. Vega. Additionally, before this Court, Petitioner focuses its arguments on evidence regarding the interpreters. (*See* Petitioner's Br. at 29-31.) Therefore, we determine that Petitioner did not bring forth sufficient evidence to satisfy its burden of showing that the office staff were independent contractors and not employees. As a result, we turn to whether the interpreters were properly classified.

*A. Free from Employer's Control or Direction*

As set forth above, the first prong of Section 4(*l*)(2)(B) requires the putative employer to show the workers are free from its control or direction. Factors for this Court to consider in determining whether an employer retains control over an individual include:  a fixed rate of pay; whether taxes were withheld; whether the employer provided tools, materials, or training; whether the employer set a time and location for work; and whether the employer had the right to monitor the work and review performances. *Weaver Hauling*, 132 A.3d at 573. No single factor is controlling, and as each case is fact specific, all factors need not be present to conclude an employment relationship exits. *Quality Care Options v. Unemployment Comp. Bd. of Review*, 57 A.3d 655, 660 (Pa. Cmwlth. 2012). The mere right or authority to exercise control is enough to prove an employment relationship. *Biter v. Dep't of Labor & Indus.*, 395 A.2d 669, 670 (Pa. Cmwlth. 1978).

Here, the Department issued an extensive set of findings of fact that highlight the many policies, procedures, and agreements Petitioner utilized in its relationships with the interpreters, which demonstrate that Petitioner retained control over the interpreters. Petitioner established the interpreters' rate of pay, although Petitioner did not withhold taxes from the interpreters. With regard to whether Petitioner provided tools, materials, or training, the Department found name badges were provided to the interpreters, as evidenced by the memorandum sent to the interpreters and the assignment sheet to be filled out by the healthcare provider. (FOF ¶¶ 5, 12.) In addition, the Department found Petitioner utilized training before the interpreters were sent out into the field as advertised on its website and as set forth in the memoranda. (*Id.* ¶¶ 2, 72-73.) Furthermore, the Department found Petitioner controlled the assignments by accepting them from medical facilities and

then communicating with the interpreters as to availability, and that the interpreters were dependent upon Petitioner for such assignments because the medical facilities refused to work with the interpreters directly. (*Id.* ¶¶ 76, 80.) The Department also found that the agreements and supplemental communications further demonstrated the control Petitioner had over the interpreters. Petitioner required non-compete agreements and exclusivity clauses be signed. (*Id.* ¶ 21.) One provision stated that "[n]o contact is to be conducted with clients except thru [sic] [Petitioner's] scheduling department." (*Id.* ¶ 57.) The Department noted that some testimony seemed to indicate that not all of these policies were enforced; however, the Department did not credit this testimony as it was contradicted by the other witnesses and memoranda sent out to the interpreters that were reviewed during the audit. (Final Decision at 22-23.) Finally, the Department found Petitioner also used an Interpreter Evaluation Form to evaluate and monitor the interpreters. (FOF ¶ 71.)

Petitioner relies upon a number of cases to support its argument that the Department erred in concluding Petitioner exercised control over the interpreters. (Petitioner's Br. at 29-31 (citing *A Special Touch*, 228 A.3d at 492-93; *Viktor*, 892 A.2d at 791-92; *Tobey-Karg*, 34 A.3d at 908; *SkyHawke Techs.*, 27 A.3d at 1055-56; *Beacon Flag*, 910 A.2d at 108).) This argument, however, is unpersuasive. While Petitioner correctly points out that no single factor is controlling and these types of cases are fact-specific and evaluated based upon a totality of the circumstances, (Petitioner's Br. at 30 (citing *Viktor*, 892 A.2d at 791)), Petitioner does not appreciate the material differences between the facts **as found** in those cases and the facts **as found** in this matter.

Petitioner cites testimony and a version of the facts that were not accepted by the Department. The Department is the ultimate factfinder, and, as such, has the

duty to weigh evidence and resolve conflicts. *Kurbatov v. Dep't of Labor & Indus., Office of Unemployment Comp. Tax Servs.*, 29 A.3d 66, 72 (Pa. Cmwlth. 2011). We cannot reweigh the evidence or disturb the Department's findings so long as they are supported by substantial evidence. "Substantial evidence 'is defined as relevant evidence upon which a reasonable mind could base a conclusion.'" *Kauffman Metals, LLC v. Dep't of Labor & Indus., Office of Unemployment Comp. Tax Servs.*, 126 A.3d 1045, 1050 n.13 (Pa. Cmwlth. 2015). When reviewing whether findings are supported by substantial evidence, we must review the record as a whole and in the light most favorable to the party that prevailed below, giving it the benefit of any inferences that can logically and reasonably be drawn from the evidence. *Id.* Furthermore, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the factfinder; the critical inquiry is whether there is evidence to support the findings actually made." *Carbondale Area Sch. Dist. v. Fell Charter Sch.*, 829 A.2d 400, 404 (Pa. Cmwlth. 2003).

As noted by the Department, Petitioner here does not specifically challenge the findings of fact. Thus, the Department argues, Petitioner waived any such challenge and the findings are binding on appeal. (Department's Br. at 9.) We agree with the Department that "[a]rguments not properly developed in a brief will be deemed waived by this Court." *Rapid Pallet v. Unemployment Comp. Bd. of Review*, 707 A.2d 636, 638 (Pa. Cmwlth. 1998). Regardless, to the extent Petitioner is seeking to assert a substantial evidence argument, it is apparent from a review of the record that there is substantial evidence to support the Department's findings.

Because Petitioner relies on a fact-heavy analysis of established case law, the cases Petitioner cites are distinguishable as each has its own unique set of facts that differ from the set of facts currently before this Court. They each involve a different

16

type of business, different rules and documents, and most importantly, different factual findings. Therefore, these cases do not require us to overturn the Department's Final Decision regarding whether Petitioner proved that it did not maintain control over the interpreters. Overall, based upon the supported findings of the Department, Petitioner maintained significant control over the interpreters, and Petitioner did not provide sufficient evidence to rebut the presumption of employment regarding control or direction in the interpreters' performances.[11]

### B. Customarily Engaged in an Independent Trade, Occupation, Profession, or Business

As defined in the recent Supreme Court opinion, *A Special Touch*, the second prong of Section 4(*l*)(2)(B) requires a putative employer to "show that an individual is actually involved in an independent trade, occupation, profession, or business to establish that the individual is self-employed." *A Special Touch*, 228 A.3d at 503. In *Viktor*, 892 A.2d at 792, the Supreme Court identified three factors to determine whether an individual is customarily engaged in an independently established business: (1) whether the individual had the ability to work for more than one entity; (2) whether the individual depended on the existence of the presumed employer for work; and (3) whether the individual was hired on a job-by-job basis and had the ability to refuse any assignment. To demonstrate that an individual is customarily engaged in his or her own business or occupation, an individual need not actually perform the same work for a third party. *A Special Touch*, 228 A.3d at 504. "[A]n individual can be an independent contractor who is simply satisfied working for a single client or at a single location depending on the circumstances." *Id*. (internal

---

[11] Having concluded the Department did not err in finding Petitioner did not satisfy the first prong of the independent contractor test, we technically do not need to address the second prong of the test, but we will do so for completeness.

quotations omitted). Whether an individual is holding himself or herself out to perform services for another is also relevant to an analysis. *Id.*

Here, once again, the Department's findings support the conclusion that the interpreters were not customarily engaged in an independently established trade. The Department found that Petitioner limited the interpreters' ability to work for other entities. Specifically, the Agreements restricted the interpreters' ability to work for other competitors through the non-compete and exclusivity clauses. (Final Decision at 25-26.) The Department also noted that "[t]he record does not indicate the actual terms of any other engagement that an interpreter working for Petitioner may have had concurrently with another agency providing similar services." (*Id.* at 25.) Petitioner also included language in the Agreements that required the interpreters to go through the scheduling department to schedule appointments, rather than to do so individually. (FOF ¶ 57.) Furthermore, the interpreters were dependent upon Petitioner, as Petitioner controlled the access to healthcare providers that were clients of Petitioner. (Final Decision at 27.) The healthcare providers refused to contract with individual interpreters, instead wishing to solely go through Petitioner to avoid multiple invoices. (FOF ¶ 76.) When considering the last factor of the *Viktor* test, it is clear, based on the Department's findings, that Petitioner's policies greatly restrained the interpreters' abilities to refuse any assignment. Any changes to availability were required to be submitted in writing two weeks before the assignment. (*Id.* ¶ 8; Final Decision at 28.) Any time off was also to be submitted as a request to Ms. Vega. (FOF ¶ 9.) Also, the interpreters were not allowed to "shift-switch" with other interpreters. (*Id.* ¶ 10.) The many findings of fact made by the Department demonstrate that Petitioner did not present credited evidence to

18

show that the interpreters were engaged in an independent trade, occupation, business, or profession.

Petitioner cites the same cases referenced above to argue that the interpreters were not customarily engaged in an independently established trade. Specifically Petitioner analogizes the case before us to *A Special Touch*, 228 A.3d at 492-93, to assert that "the interpreters here do work and are free to work for other agencies and other individuals." (Petitioner's Br. at 31.) While we are bound by precedent, we again note that no single factor is controlling and these types of cases are fact-specific and evaluated based upon a totality of the circumstances. *Viktor*, 892 A.2d at 791. Furthermore, Petitioner references testimony beyond the Department's findings of fact, and as stated before, we are bound by the Department's findings as they are supported by substantial evidence. *See Carbondale*, 829 A.2d at 404. Therefore, we conclude that Petitioner did not present credited evidence to demonstrate that the interpreters were engaged in an independent trade, occupation, business, or profession, which was required to rebut the presumption of an employment relationship.

## IV.   CONCLUSION

Based on the Department's findings of fact, Petitioner did not satisfy its burden to rebut the presumption of an employer-employee relationship. Accordingly, we affirm the Department's Final Decision.

_____

**RENÉE COHN JUBELIRER,** Judge

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Ingrid L. Vega, d/b/a Professional :
Interpreters of Erie,  :
                         Petitioner  :
                                     :
                 v.  :    No. 1787 C.D. 2019
                                     :
Commonwealth of Pennsylvania,  :
Department of Labor and Industry,  :
Office of Unemployment Compensation  :
Tax Services,  :
                       Respondent  :

## O R D E R

NOW, November 12, 2020, the Final Decision of the Department of Labor and Industry, dated December 6, 2019, is **AFFIRMED.**

_____
**RENÉE COHN JUBELIRER,** Judge