**TOBEY–KARG SALES AGENCY, INC., Petitioner**

**v.**

**PENNSYLVANIA DEPARTMENT OF LABOR AND INDUSTRY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2011.

Decided Dec. 30, 2011.

---

Thomas G. Michalek, Pittsburgh, for petitioner.

Robin H. Grenoble, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge COHN JUBELIRER.

Tobey–Karg Sales Agency, Inc. (Tobey–Karg) petitions for review of the Order of the Pennsylvania Department of Labor and Industry (Department) denying Tobey–Karg's Petition for Reassessment of a Notice of Assessment (Petition) filed by the Office of Unemployment Compensation Tax Services (OUCTS). The Notice of Assessment (Notice) issued by OUCTS characterized Tobey–Karg's sales representatives as employees, not independent contractors, and assessed Tobey–Karg for past unpaid Unemployment Compensation (UC) contributions, interest, and penalties on wages not previously reported to the Department. On appeal, Tobey–Karg argues that the Department erred in denying its Petition because: (1) the Department erred in concluding that Tobey–Karg did not prove its entitlement to the exclusion set forth in Section 4($l$)(2)(B) of the

Unemployment Compensation Law (Law),[1] 43 P.S. § 753(l)(2)(B), where it failed to establish that Tobey–Karg's sales representatives were "customarily engaged in an independently established trade," *id.*; and (2) the Department violated Tobey–Karg's due process rights under the Fourteenth Amendment of the United States Constitution by, *inter alia,* not providing notice of the basis of the Department's charges or claims so that it could properly defend itself during the hearing. For the following reasons, we reverse the Department's Order.

Tobey–Karg, a Pittsburgh-based business, is involved in the sale of heating, ventilation, and air-conditioning (HVAC) equipment to builders and contractors, and "has exclusive sales agreements with ten to twelve HVAC manufacturers." (Department's Findings of Fact (FOF) ¶¶ 1–2, 4.) Individuals with prior knowledge and experience are used as its sales representatives, with whom Tobey–Karg executes a Sales Representative Agreement (SRA). (FOF ¶¶ 5, 34.) OUCTS conducted a random audit of Tobey–Karg's records and determined that the sales representatives were not independent contractors, but employees, and pursuant to Section 304 of the Law, 43 P.S. § 784,[2] OUCTS issued the Notice, assessing Tobey–Karg with UC contributions, interest, and penalties in the amount of $5,732.67. The Notice indicated that Tobey–Karg's liability had not been reported to the Department on the required UC quarterly reports from the first quarter of 2004 through the third quarter of 2007. Tobey–Karg filed the Petition seeking reassessment, and a hearing was held before an Administrative Law Judge

(ALJ) on October 16, 2008, to determine whether the sales representatives were employees or independent contractors.[3]

The Department offered the testimony of Dawn R. Spolarich, the OUCTS representative who audited Tobey–Karg. Tobey–Karg presented the testimony of, *inter alia,* co-owner Creed Hess and Michael Sears, a sales representative, and documentary evidence. Based on the testimony and evidence, the Department issued a determination in which it set forth findings of fact, including the following. Sales representatives are assigned primary customers, but they are not restricted to a particular geographic area to generate sales to new customers. (FOF ¶¶ 6–7.) In finding new customers, sales representatives review advertisements for potential jobs or will receive solicitations to bid from contractors. (FOF ¶¶ 8–9.) The sales representatives: decide which jobs to bid; obtain the project bid documents (including plans and specifications) to determine what equipment is needed for the job, although they do not receive those documents from Tobey–Karg; determine what products they wish to bid on a project; and obtain price quotes from the manufacturers before submitting their bid. (FOF ¶¶ 10–14.) The bids are not awarded to the sales representative, but to Tobey–Karg; however, the sales representatives will place the orders for the equipment. (FOF ¶¶ 15–16.) The sales representatives are paid solely on commission, but have a draw account with Tobey–Karg which, if taken, must be repaid from the sales representative's commission. (FOF ¶¶ 17, 21.) "Sales representatives can and do sell products from companies other than those

---

**1.** Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended.*

**2.** Section 304 of the Law sets forth the reporting requirements for employers under the law and provides the Department with the author-

ity to make assessments, which include interest, against employers who do not make the required contributions. 43 P.S. § 784.

**3.** It appears that this is the only involvement the ALJ had in this matter.

having exclusive agreements with Tobey–Karg," and the sales representatives pay a part of their commission for these outside sales to Tobey–Karg. (FOF ¶¶ 18–19.) The sales representatives: (1) are not paid until the culmination of the sale and the customer pays for the order, which can "take weeks, months or even years"; (2) do not have set hours of work, sales quotas, or a dress code; (3) are not required to submit sales reports or attend sales meetings; (4) are not provided sick, vacation, or holiday pay; (5) are not given any tools or training, which sales representatives receive directly from the manufacturers; (6) must pay their own expenses and are not reimbursed by Tobey–Karg; and (7) receive federal 1099 tax forms, which are used for independent contractors. (FOF ¶¶ 22–33, 41–42.)

The Department found that the SRA "prevent[s] sales representatives from taking business from Tobey–Karg upon termination of the agreement,"[4] and "Section 2, Paragraph A,[5] provides that pricing is not at the sole discretion of the sales representative." (FOF ¶¶ 35–36.) However, Mr. Hess stated "that Tobey–Karg does not establish pricing for" its sales representatives and the "sales representatives set pricing based upon market conditions." (FOF ¶¶ 37–38.) "Section 1, Paragraph B [states] that a sales representative will not enter into any agreement for sale, service, installation or handling of any kind, any products similar to those of the exclusive manufacturers without prior written approval of Tobey–Karg." (FOF ¶ 39.) Finally, the SRA requires that when it is terminated, "all correspondence, blueprints, quotations, plans and other written information reasonably necessary to carry on sales shall be transferred and delivered to Tobey–Karg." (FOF ¶ 40.)

The Department concluded, based on its factual findings, that Tobey–Karg had failed to meet the exclusionary provisions of Section 4($l$)(2)(B) for services performed by the sales representatives. The Department held that Tobey–Karg satisfied the first prong of Section 4($l$)(2)(B)(a)—that the sales representatives were free from control and direction over the performance of their work—but did not prove the second prong of Section 4($l$)(2)(B)(b)—that the sales representatives were customarily engaged in an independently established trade or occupation. (Department's Op. at 10–11.) In concluding that the sales representatives were employees, the Department relied upon the analysis found in *Electrolux Corporation v. Department of Labor and Industry, Bureau of Employer Tax Operations,* 705

4. We note that the Department did not cite a particular SRA section to support this finding of fact. However, we point out that there were two SRAs submitted into evidence. One SRA governs four of Tobey–Karg's sales representatives, (R.R. at 131a–34a), and a second, newer SRA governed the fifth. (R.R. at 124a–28a). The second SRA contained a new section, a non-compete provision, that was added after former sales representatives left Tobey–Karg, began their own business, and sought to take Tobey–Karg's customers. (Hr'g Tr. at 49–52, R.R. at 49a–52a.) With the exception of the new non-compete provision, the two SRAs are the same.

5. This provision states:

Tobey–Karg agrees to pay a commission or percentage of its gross profit to Sales Representative on orders accepted by the Manufacturer [one of Tobey–Karg's exclusive manufacturers] or by Tobey–Karg which have been shipped and paid for by the customer in accordance with the applicable rules, schedules, price sheets and regulations which have been published from time to time by the Manufacturer or Tobey–Karg are then in effect or which have been agreed upon in [writing] between Tobey–Karg and the Sales Representative for items or prices not covered by such documents. (SRA at 1–2, R.R. at 131a–32a.)

A.2d 1357, 1362 n. 5 (Pa.Cmwlth.1998), and the facts that: (1) sales representatives must receive written approval before entering "into an agreement for sale, service, installation or handling of any kind, any products similar to those of the exclusive manufacturers without prior written approval of Tobey–Karg"; (2) the SRA requires that when it is terminated, "all correspondence, blueprints, quotations, plans and other written information reasonably necessary to carry on sales shall be transferred and delivered to Tobey–Karg; and (3) sales representatives were required to pay Tobey–Karg a portion of their commissions from outside sales, i.e., sales of products not from Tobey–Karg's exclusive manufacturers. (Department's Op. at 10–11.) Tobey–Karg now petitions this Court for review.[6]

▇▇▇ Section 4(*l*)(2)(B) of the Law provides, in relevant part:

> (B). . . . Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that—(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business.

43 P.S. § 753(*l*)(2)(B). Once it is shown that a person has performed services for wages, the burden shifts to the employer to show that the worker is an independent contractor. *Bureau of Employment Security v. Hecker & Company*, 409 Pa. 117, 122, 185 A.2d 549, 552 (1962). "[A] claimant can be classified as self-employed [o]nly when the employer establishes that a claimant (a) has been and will continue to be free from control or direction over the performance of his or her services [a]nd (b) is customarily engaged in an independent trade." *Kardon v. Unemployment Compensation Board of Review*, 40 Pa. Cmwlth. 20, 396 A.2d 487, 488 (1979). Whether a claimant is an employee or an independent contractor is a question of law subject to our review. *Sharp Equipment Company v. Unemployment Compensation Board of Review*, 808 A.2d 1019, 1023 n. 6 (Pa.Cmwlth.2002). Here, the Department found that Tobey–Karg satisfied subsection (a) and, therefore, the only issue is the "customarily engaged in an independently established trade" prong of subsection (b). 43 P.S. § 753(*l*)(2)(B).

Tobey–Karg argues that the Department erred in concluding that its sales representatives are employees under the Law because the Department disregarded the testimony of Mr. Spears and substantial case law interpreting Section 4(*l*)(2)(B) and based its determination on *Electrolux*, a case that had very specific facts that are distinguishable from the present matter. Furthermore, it maintains that this matter is more akin to *Danielle Viktor, Ltd. v. Department of Labor and Industry, Bureau of Employer Tax Operations*, 586 Pa. 196, 892 A.2d 781 (2006), than *Electrolux*. Tobey–Karg asserts that, contrary to the Department's holding, its sales representatives can and do re-sell a substantial amount of outside products and that the sales representatives voluntarily submit those orders through Tobey–Karg be-

---

**6.** "The Court's review is limited to determining whether constitutional rights were violated, whether an error of law was committed, whether a practice or procedure of the Board was not followed or whether the findings of fact are supported by substantial evidence in the record." *Western & Southern Life Insurance Co. v. Unemployment Compensation Board of Review*, 913 A.2d 331, 334 n. 2 (Pa.Cmwlth.2006).

cause, then, Tobey–Karg handles all of the administrative matters associated with the contract. According to Tobey–Karg, the Department has misconstrued multiple provisions of the SRA, particularly Section 1, Paragraph B (related to obtaining written approval to sell similar products), and Section 6, Paragraph D (requiring sales representatives to turn documents related to existing and ongoing sales into Tobey–Karg). Tobey–Karg maintains that, despite the Department's characterization, Section 1, Paragraph B, requires written approval only for sales of items that are *similar* to those of Tobey–Karg's exclusive manufacturers and does not require approval for *any* sale. Moreover, Tobey–Karg contends that Section 6, Paragraph D, does not, as the Department held in its opinion, mean that sales representatives are not able to take work away from Tobey–Karg or cannot work in HVAC sales if the SRA is terminated. Rather, it merely requires that the information, i.e., documents, blueprints, etc., that are necessary for Tobey–Karg to complete the contractual obligations related to *existing, ongoing, and completed* sales remain with Tobey–Karg.

The Department contends that it properly concluded that the sales representatives were employees because the essence of the second prong is that the person is engaged in business without interference from any other person or entity and this is not the case for Tobey–Karg's sales representatives. The Department points out that Tobey–Karg did not present any evidence that its sales representatives make any sales separate from Tobey–Karg such that they did not pay part of their commissions to Tobey–Karg. The Department asserts that, under the SRA, the sales representatives cannot sell similar products without Tobey–Karg's assent and without sharing their profits with Tobey–Karg; therefore, the sales representatives

are not free from interference of another person or entity.

■ In considering whether an employer has satisfied the second prong of Section 4($l$)(2)(B), that the individuals were customarily engaged in an independent trade, we must consider whether: (1) "the individual was capable of performing the activities in question to anyone who wished to avail themselves of the services"; and (2) "the nature of the business compelled the individual to look to only a single employer for the continuation of such services." *Venango Newspapers v. Unemployment Compensation Board of Review,* 158 Pa.Cmwlth. 379, 631 A.2d 1384, 1388 (1993). Thus, in *Venango,* we held that because the worker *could* work for another employer, the worker was an independent contractor, not an employee. *Id.* In making this determination, no one factor is dispositive; rather, "the unique facts of each case must be examined in order to resolve the question of" a claimant's status as an employee or independent contractor. *Beacon Flag Car Company, Inc. (Doris Weyant) v. Unemployment Compensation Board of Review,* 910 A.2d 103, 109 (Pa. Cmwlth.2006).

Initially, we note that the Department placed great emphasis on Section 1, Paragraph B, for the fact that Tobey–Karg did not permit sales representatives to sell similar products from outside manufacturers unless they obtained prior written approval. This Court was faced with a similar issue in *SkyHawke Technologies, LLC v. Unemployment Compensation Board of Review,* 27 A.3d 1050, 1057–58 (Pa. Cmwlth.2011), wherein the employer required its workers to sign a non-compete agreement and a "third-party services agreement" in which the worker had to inform the employer of any such agreements and employer could terminate its

agreement with the worker if the other agreement posed actual or potential conflict to the employer. We held that neither agreement was dispositive of whether the employer met the second prong, noting that, in *Beacon Flag*, 910 A.2d at 109,

> we explained that the Supreme Court in *Viktor* held that "the ability to work for more than one enterprise [was] an important factor in determining independent contractor status pursuant to [S]ection 4(*l*)(2)(B)," but it "was not the only factor." *Beacon Flag*, 910 A.2d at 109. Once again, citing *Viktor*, we emphasized that "the unique facts of each case must be examined in order to resolve the question of a claimant's status as an employee or independent contractor. *Id.*"

*SkyHawke*, 27 A.3d at 1057–58. Thus, the fact that the SRA indicates that sales representatives were to obtain written approval prior to selling products that competed with Tobey–Karg's exclusive manufacturers is just one factor to consider. We note, however, that Mr. Hess indicated that Tobey–Karg did not actually follow this provision, and that it was entirely up to the sales representative to determine what products, exclusive or outside, to include in a bid to a contractor customer. (Hr'g Tr. at 66–67, R.R. at 66a–67a.) Indeed, it is undisputed that Tobey–Karg generally approved of these outside sales, as evidenced by Mr. Sears's testimony that approximately ninety percent of his sales included outside products and Mr. Hess's testimony that such sales resulted

in more than $1.5 million in sales in 2006 and $1.1 million in sales in 2007. (Hr'g Tr. at 44–45, 75, R.R. at 44a–45a, 75a; Lists of Sales Representatives' Outside Manufacturers and the 2006 and 2007 sales from those Manufacturers, R.R. at 135a–41a.) Furthermore, Mr. Hess indicated that the use of the Tobey–Karg name and letterhead for these outside sales was associated with providing the sales representatives with a name familiar to the contractor customers and the convenience to those customers of writing one purchase order to Tobey–Karg, rather than to multiple venders.[7] (Hr'g Tr. at 62, 68, R.R. at 62a, 68a.)

Next, we point out that Section 6, Paragraph D, does not support the Department's contention that the sales representatives could no longer sell HVAC equipment or were prevented "from taking business from Tobey–Karg upon termination of the [SRA]." (Department Op. at 9, 11.) That provision states:

> On the termination of this [SRA], the Sales Representative agrees that all correspondence, blueprints, quotations, plans and other written information reasonably necessary to carry on the sales in which the Sales Representative has an interest and the regular business previously conducted to the Sales Representative shall be transferred and delivered to Tobey–Karg.

(SRA at 4, R.R. at 134a.) There is nothing in this paragraph that indicates that a

7. Mr. Hess explained that, where sales representatives make direct sales, i.e., the sale of a product manufactured by one of Tobey–Karg's exclusive manufacturers, the contractor customer makes its purchase order out directly to the manufacturer, which has the right to approve the sale after reviewing the contractor customer's credit, etc. (Hr'g Tr. at 62–63, R.R. at 62a–63a.) However, where a sales representative put together an equip- ment package that included multiple manufacturers, the contractor customer would have to prepare multiple purchase orders, one to each manufacturer, unless the sales representative ran the project through Tobey–Karg, which would issue one bill to the contractor customer and would, in turn, pay the various manufacturers on the contractor customers' behalf. (Hr'g Tr. at 68, R.R. at 68a.)

sales representative is precluded from selling HVAC equipment after the SRA is terminated and, even if it did, that it would constitute a non-compete clause, which is just one factor to be considered in the totality.[8] *Beacon Flag,* 910 A.2d at 109. Moreover, the remainder of the paragraph is associated with allowing Tobey–Karg to carry on with providing service to those sales of HVAC equipment that are in the process of being carried out at the time of the sales representative's departure and for past sales that were completed. We conclude that such factors do not require that the sales representatives are Tobey–Karg's employees.

We next consider whether the Department's reliance on *Electrolux* was proper or whether *Viktor* requires that we reverse the Department's determination. In *Electrolux* the Department found that door-to-door vacuum cleaner sales people were employees, not independent contractors, because: "(1) the services of selling Electrolux products is being rendered for Electrolux; and (2) the sales representatives are compelled by their contract to look *only* to Electrolux for the continuation of the service of selling vacuum cleaners." *Electrolux,* 705 A.2d at 1362 (emphasis added). Tobey–Karg asserts that *Electrolux* is distinguishable because it involved a very narrowly defined "business," the direct sales of vacuum cleaners, and there was a specific prohibition against the sales representatives from selling vacuum cleaners, parts, or accessories from any other vacuum cleaner company. We agree that *Electrolux* is distinguishable. Here, unlike in *Electrolux,* the sales representatives were permitted by the SRA to sell, and they did sell, HVAC equipment from competing companies. There is no dispute that Tobey–Karg approves these sales, as evidenced by the testimony of both Mr. Hess and Mr. Sears, and the lists of outside manufacturers used by each sales representative. (Hr'g Tr. at 44–45, 66–67, 75, R.R. at 44a–45a, 66a–67a, 75a; Lists of Sales Representatives' Outside Manufacturers, R.R. at 135a–39a.) Moreover, it is enough that the sales representatives *could* offer their services to other entities, including competing entities. *Department of Labor and Industry v. Aluminum Cooking Utensil Company,* 368 Pa. 276, 282, 82 A.2d 897, 899–900 (1951); *Venango,* 631 A.2d at 1387.

In *Viktor* the issue before the Supreme Court was whether individuals who drove for limousine companies were independent contractors or employees pursuant to Section 4($l$)(2)(B). The Department concluded that they were employees, this Court reversed, and our Supreme Court affirmed. Noting that the first of the statutory criteria was satisfied, the Supreme Court focused, as we do here, on the second criteria. The Supreme Court described this criteria as "address[ing] the mechanism through which a Driver furnishes his or her services to a limousine company, [and] requir[es] that, for purposes of being an independent contractor[s], the worker must conduct his or her driving services as an 'independently established' business." *Viktor,* 586 Pa. at 214, 892 A.2d at 792. The Department

---

**8.** The new SRA, (R.R. at 124a–28a), does contain a non-compete clause. However, as stated, this would be just one factor to consider and, given that the new SRA does not fully restrict the sales representative from selling any and all HVAC equipment to any and all customers, it does not appear to support the conclusion that the sales representatives were employees. (SRA at 4, R.R. at 127a.) The limitations involved are mainly associated with the sale of Tobey–Karg's exclusive manufacturers' equipment within Tobey–Karg's geographic area for a period of three years and the solicitation of the contractor customers with whom the sales representatives personally conducted business within the year prior to the termination of the SRA. (SRA at 4, R.R. at 127a.)

argued that, because the drivers did not own, insure or maintain the limousines they drove, they did not have a proprietary interest in their business where they did not, alone, suffer the risk of loss and, therefore, were not independent contractors. *Id.* The Supreme Court held that, while having a proprietary interest in his or her enterprise is suggestive of being an independent contractor, it is not a necessary element, but is one factor to consider. *Id.* at 227, 892 A.2d at 800. Additionally, the Supreme Court held that the Department's assertion that the broad, remedial purpose of the Law required the drivers to be considered employees rang hollow because: (1) the drivers themselves did not consider themselves employees who were entitled to UC benefits, noting that the drivers had never applied for either UC or workers' compensation benefits; and (2) the language in *Aluminum,* offered to support the Department's argument, actually supported the Supreme Court's conclusion that the drivers were independent contractors. *Id.* at 219–21 & n. 12, 892 A.2d at 795–97 & n. 12. Specifically, the Supreme Court cited these factors from *Aluminum* to support its conclusion that: (1) the salespeople could and did sell merchandise other than Aluminum's products; (2) they can and do engage in similar work with others; (3) "their occupations are not confined to, nor 'established' only for, the performance of [Aluminum's] work"; (4) while the majority of the business is handling Aluminum's products, it is not the sole part; (5) they could set the prices for the products they sold; and (6) they were constantly selling the products of multiple competitors at the same time. *Id.* at 220–21, 892 A.2d at 796 (quoting *Aluminum,* 368 Pa. at 278–79, 282, 82 A.2d at 898–900.) Those same factors were present in *Viktor* and the Supreme Court pointed out that the drivers could, *inter alia:* select the assignments that they wanted to accept or

reject; work for competitors; and make their own schedules. *Viktor,* 586 Pa. at 229–30, 892 A.2d at 801–02.

Tobey–Karg argues that, although *Viktor* is not entirely on point factually, its legal holding, and the cited factors from *Aluminum,* support its assertion that its sales representatives are independent contractors. The Department contends that Tobey–Karg has misplaced its reliance on *Viktor,* where Tobey–Karg acknowledges that it is factually different, and on *Aluminum,* because there was no obligation that the sales people in that case were required to go through Aluminum to place all of their sales. We agree with Tobey–Karg that these cases support the conclusion that its sales representatives are independent contractors.

Reviewing the variety of factors cited by the Supreme Court in *Viktor* and *Aluminum,* we cite the following similarities. Here, Mr. Sears testified that he does not want to be an employee, but an independent contractor, (Hr'g Tr. at 78, R.R. at 78a), and Mr. Hess indicated that none of Tobey–Karg's sales representatives have ever filed for UC or workers' compensation benefits, (Hr'g Tr. at 45–46, R.R. at 45a–46a.) *Viktor,* 586 Pa. at 219–21 & n. 12, 892 A.2d at 795–97 & n. 12. The sales representatives could and did sell products to their contractor customers other than those made by Tobey–Karg's exclusive manufacturers and, on some occasions, sold directly competing products. *Id.* at 221, 892 A.2d at 796–97; *Aluminum,* 368 Pa. at 278, 280, 82 A.2d at 898–99. The sales representatives decided, *inter alia,* their schedules, what jobs they were going to bid, and what products they were going to use in their bids, i.e., how they were going to perform their duties. *Viktor,* 586 Pa. at 225–26, 892 A.2d at 799. Finally, although not *the* dispositive factor as established in *Viktor,* the sales representa-

tives have a proprietary interest in their enterprise as they are the ones who, ultimately, bear the risk in their enterprises to sell HVAC equipment. They find the jobs, put together the HVAC packages to sell, submit the bids, purchase their own tools, order the equipment, are paid only when the contractor customers pay for the equipment and, according to Mr. Hess and Mr. Sears, if there is a financial loss from a sale, the sales representatives bear that loss. (Hr'g Tr. at 34–36, 72–78, R.R. at 34a–36a, 72a–78a.)

■ We acknowledge that Tobey–Karg does have some impact on the sales representatives' outside sales business by requiring, at least pursuant to the SRA, the approval and the payment of a commission; however, these are just two factors to consider. Our Supreme Court, in *Viktor*, rejected the Department's argument in that case that, if a worker has *any* type of dependence on some other entity, then the worker cannot be characterized as an independent contractor. *Viktor*, 586 Pa. at 223, 892 A.2d at 798. The totality of the circumstances here includes: (1) the sales representatives have complete control over whether they bid on any particular construction project; (2) the sales representatives have complete discretion in what products to use in any particular bid; (3) Tobey–Karg approved these outside sales on a regular basis, in the amount of over $1 million in 2006 and 2007, (Hr'g Tr. at 44–45, 66–67, 75, R.R. at 44a–45a, 66a–67a, 75a); (4) although Tobey–Karg takes a percentage of the commission on outside sales, Tobey–Karg provides the convenience for the sales representatives' contractor customers to pay only one invoice,

to Tobey–Karg, rather than to multiple manufacturers; (5) the sales representatives have never filed for UC or workers' compensation benefits; (6) the sales representatives bear all the financial risks associated with their sales and, if there is a mistake, they, not Tobey–Karg, pay for it; and (7) the sales representatives receive federal 1099 tax forms, which are used by independent contractors. In viewing these circumstances in their totality, we conclude that the sales representatives are not employees, but are independent contractors pursuant to Section 4(*l*)(2)(B) of the Law.

Accordingly, the Order of the Board is reversed.[9]

### ORDER

NOW, December 30, 2011, the Order of the Pennsylvania Department of Labor and Industry in the above-captioned matter is hereby **REVERSED**.

9. Because we hold that the Department erroneously concluded that the sales representatives were employees and Tobey–Karg does not have to pay the assessments charged, we conclude that it is not necessary to address Tobey–Karg's due process arguments. The remedy for any due process violation would be for this Court to remand the matter for a new hearing held in accordance with due process, which is not necessary because of our determination that the Department erred.