IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Linda's Cleaning Consultants, Inc., :
                Petitioner :
         v. :
        :
Department of Labor and Industry, :
Office of Unemployment :
Compensation Tax Services, : No. 457 C.D. 2021
               Respondent : Submitted: December 4, 2023


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge


OPINION
BY JUDGE FIZZANO CANNON                FILED: January 18, 2024


      Linda's Cleaning Consultants, Inc. (Employer) petitions for review of the March 26, 2021, decision and order of the Department of Labor and Industry (Department). The Department denied Employer's petitions for reassessment of its required contributions to the unemployment compensation (UC) system after concluding that certain of Employer's workers were employees and not independent contractors. Upon review, we affirm.

## I. Factual and Procedural Background

      In November 2016, the Department's Office of Unemployment Compensation Tax Services (Office) issued notices to Employer assessing roughly $24,000 in UC contributions, interest, and penalties for all quarters of calendar years

2012 through 2015 and roughly $6,500 for the first three quarters of 2016.[1] Department's Final Decision and Order, 3/26/21, at 1-2; Certified Record (C.R.) #24. After Employer filed petitions for reassessment, the matters were consolidated, and a hearing officer conducted a hearing on November 8, 2018. *Id*. at 2.

Biju Varukunnel (Varukunnel), a UC tax agent, testified for the Office. Reproduced Record (R.R.) at 14a. He audited Employer's records and prepared the notices of assessment. *Id*. at 15a. The 2012-15 assessment was based on Employer's records during those years, and the 2016 assessment was an estimate based on the 2015 records.[2] *Id*. at 16a. The investigation and audit process began when an individual filed a claim for UC benefits, but that person's wage information was not in Employer's reported records. *Id*. at 19a. Varukunnel discovered during his audit that although Employer is registered as a cleaning consultant, its disbursement records indicated that workers were being paid for construction activities (including painting and flooring). *Id*. at 21a & 52a-53a. He also found that Employer's workers did not invoice Employer for their remuneration. *Id*. at 22a. Varukunnel concluded that Employer primarily provided cleaning services, but if a customer asked for home improvement work, Employer sent someone to do it and paid that person directly. *Id*. at 54a. Varukunnel stated that he also based his conclusions on documents he received from Employer during the audit and from UC-110 forms sent to Employer and to worker-claimants; the UC-110 form asks for the type of work

---

[1] Section 301 of Pennsylvania's Unemployment Compensation Law (UC Law), Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§ 751-919.10, requires employers to pay contributions into the UC system; the contributions are based on employee wages and calculated using a statutory formula. *See* 43 P.S. § 781.

[2] The parties ultimately stipulated that the amount at issue is $6,480.25, which is slightly lower than the Office's estimate of $6,500. Certified Record (C.R.) #23.

performed and whether the claimant has his own independent trade or business. *Id*. at 58a-61a.

Linda Goldstein (Goldstein) testified for Employer. R.R. at 67a. She is Employer's officer and principal. *Id*. She started the business as a house cleaning service and obtained clients by word of mouth. *Id*. at 68a. She would go to see a house, talk to the customer, assess a price, and offer the job to one of her cleaners. *Id*. The cleaners did not work for her on a full-time basis, and they did not have to take an offered job. *Id*. They would let her know their schedule on a weekly basis and she would offer them jobs that fit their availability. *Id*. She charged customers a flat fee for cleaning and the cleaner would get a share of that charge; customers did not know how much of a job would be her fee and how much went to the cleaner. *Id*. at 69a & 117a-18a. Customers were to provide cleaning supplies although the cleaners could bring their own if they wanted. *Id*.

Goldstein did not train her cleaners, go on cleaning jobs with them, or review their work after it was done. R.R. at 69a & 71a. She emphasized that her cleaners were experienced and "good in the industry" and that if she got a complaint from a customer, "the girls have to take care of it. They'll go back. If a customer calls and says, 'You know, she missed this.' I say, 'okay,' and I call [the cleaner] and say, 'You've got to go back,' and they do." *Id*. She did not provide transportation or phones and the cleaners did not stop in her office or check in with her before or after jobs. *Id*. at 70a-71a. They could reschedule with the customer without checking with her. *Id*. at 70a. They paid their own taxes. *Id*. Their hours and days of the week varied as needed. *Id*. Goldstein did not provide them with uniforms but asked them to "dress appropriately" when they did jobs for her. *Id*. at 71a. She stated that most of her cleaners also did cleaning work for other customers

outside of her arrangements with them, but she did not know if they advertised. *Id.* at 72a & 107a.

On cross-examination, Goldstein explained that for her cleaning customers, she took 10%-20% of the total charge. R.R. at 75a & 106a. For example, she might charge the customer $100, of which the cleaner would get $80, and she would get $20. *Id.* at 76a. She reiterated that her cleaners could say no when she offered them a job and that they liked the freedom of the arrangement. *Id.* The customers usually paid the cleaner at the time of the job, but if they didn't, she would follow up with a phone call or an email to the customer; she would send a bill if necessary. *Id.* at 77a. Some customers would give the cleaner a check and the cleaner would bring it and other customer checks to her office once a week; she would add up the receipts and pay the cleaners. *Id.* at 78a. She also received cash and electronic checks from customers' bank accounts. *Id.* at 79a.

Goldstein stated that customers' rates for cleaning and the cleaners' rate or percentage of the charged amount remained the same; she kept a chart of that information but did not have it with her at the hearing. R.R. at 81a-82a. If a customer built an addition to their house or got a pet that created more work for the cleaners, she would talk to the customer and either increase the charge or lessen the cleaner's duties for the same charge as before. *Id.* at 83a. Cleaners could tell her if they thought she should increase a customer's charge and could opt out of doing that job if Goldstein was unable to raise the charge. *Id.* at 102a-03a. Cleaners could keep tips from customers. *Id.* at 84a. Goldstein got Social Security numbers from all her cleaners, who came to her by word of mouth from her current cleaners; she did not advertise for cleaners to come work for her. *Id.* at 90a. Sometimes cleaners would

put up fliers and get their own responses and potential clients, then reduce their availability for her to send them to her customers. *Id*. at 91a.

Regarding Employer's construction work, Goldstein stated that some cleaning customers would ask her if she knew anyone able to do painting, window washing, hanging pictures and window treatments, and carpet cleaning. *Id*. at 68a & 72a. She knew individuals with those skills already and connected them with her cleaning customers. *Id*. She did not set those prices, schedule the work, or supervise the workers. *Id*. at 68a. Instead, she took a "limited finder's fee" after the job was done and paid for by the customer; she considered herself a "concierge" providing her clients with whatever they needed that she was able to provide for them. *Id*. at 68a. If a customer did not pay the worker directly for home improvement services, she would send the customer a bill and once it was paid, she would send the worker the money after taking out her percentage for the referral. *Id*. at 72a-73a. The workers usually told her how much of the total would be her fee for the referral. *Id*. at 120a-21a. She recalled no disputes over that amount or any instance where a worker went behind her back to avoid paying her fee; she figured they had the right to do that, but they wanted to keep good relations with her for future referrals. *Id*.

Goldstein testified that the individuals she referred to her customers for construction or renovation jobs worked for themselves; they had limited liability companies (LLCs) or corporations, carried their own insurance, and had their own vehicles, supplies, and tools. R.R. at 73a. She did not supply anything to them, supervise them, or review their work, but they knew she expected them to do good work for her customers. *Id*. at 74a-75a. If she got a complaint from a customer, she would immediately call the worker about it and the worker would take care of the problem with the customer. *Id*. at 75a & 93a.

5

On cross-examination, Goldstein stated that her referral fee for construction services was usually 10%-15% of the total charge. *Id.* Sometimes her customers paid the workers directly but sometimes they sent her a check for the work because she made the referral and they felt more comfortable paying her; she would pay the worker out of that amount, less her fee. *Id.* at 87a & 112a-13a. She obtained the workers' Social Security numbers, federal employer identification numbers (FEIN), and copies of insurance certificates but admitted she had not provided those certificates to the Department during the audit process. *Id.* at 89a & 94a. She had signed contracts with some of them, which had been provided to the Office during the audit, but not with others if she issued them a 1099 tax form or if they had their own LLC or corporation. *Id.* at 89a, 93a & 100a. Some of the workers she used advertised and had social media sites, but she had longstanding relationships with most of them based on having used them herself or by word-of-mouth referrals. *Id.* at 92a. If one of the workers broke something at the customer's house, she worked with the individual and customer to fix or replace it. *Id.* at 94a. She did not have an exclusive relationship with these workers, and they did not work for her at set times. *Id.* at 95a.

Goldstein acknowledged that although the construction workers did their own estimates, she would sometimes handle the arrangements with the customer because of her established relationship with both sides. R.R. at 115a & 119a. The arrangements were mostly informal and particular to each transaction and the relationship she had with that worker. *Id.* She asked the workers to let her know when a job was done so she could either take it off of her "to do" list or follow up if anything else was needed. *Id.* at 123a-24a. Although she previously stated that she thought the workers had the right to agree separately with a customer in order to

6

avoid paying her fee, she acknowledged that at least one contract had a clause forbidding the worker from pursuing her customers independently. *Id*. at 122a.

The hearing concluded with brief closing arguments by the parties, who agreed that the matter could be decided on the evidence in lieu of briefing. R.R. at 125a-33a. The Department issued its final decision and order under the signature of Executive Deputy Secretary Robert V. O'Brien on March 26, 2021. Dep't Decision; C.R. #24. The Department concluded that 37 individuals (27 cleaners and 10 construction workers) were paid by Employer for services performed; therefore, a presumption of employment attached, and the burden shifted to Employer to prove that those individuals were independent contractors. *Id*. at 17. The Department analyzed the construction workers under the Construction Workplace Misclassification Act, Act of October 13, 2010, P.L. 506, 43 P.S. §§ 933.1-933.17 (CWMA), and the cleaners under the UC Law and ultimately concluded that Employer failed to establish that the 37 individuals were independent contractors. *Id*. at 27. Employer's petitions for reassessment were therefore denied and it was deemed liable for the assessments as set forth in the November 2016 notices. *Id*. Employer timely appealed to this Court.

## II. Issues

Employer first argues that the Department erred in applying the CWMA to the 10 construction workers because Employer is not in the business of construction as required by the CWMA. Employer's Br. at 11. Employer also argues that the Department erred in weighing the evidence to reach the conclusion that under the UC Law, the 27 cleaners at issue here were employees rather than independent contractors. *Id*.

7

## III. Discussion

Section 301 of the UC Law requires employers to pay contributions into the UC system based on their employees' wages. *See* 43 P.S. § 781(a)(1).[3] The UC Law defines "employment" as "all personal service performed for remuneration by an individual under any contract of hire, express or implied, written or oral, including service in interstate commerce, and service as an officer of a corporation." Section 4(*l*)(1) of the UC Law, 43 P.S. § 753(*l*)(1). "Once the Department shows that an individual is performing services for wages, as that term is defined under the [UC Law], the burden shifts to the taxpayer to bring itself within an exception" that would relieve the employer of having to pay contributions. *A Special Touch v. Dep't of Lab. & Indus.*, 228 A.3d 489, 503 (Pa. 2020) (quotation marks omitted). Employer contributions are a tax and therefore are to be construed in the employer's favor, but the burden of disproving an individual's employee status is heavy. *Jia v. Unemployment Comp. Bd. of Rev.*, 55 A.3d 545, 548 (Pa. Cmwlth. 2012); *Gulf & W. Corp. v. Dep't of Lab. & Indus., Off. of Emp. Sec.*, 459 A.2d 1369, 1371 (Pa. Cmwlth. 1983).

The relevant exception in both issues raised by Employer is whether an individual is an independent contractor as opposed to an employee. Subsection 4(*l*)(2)(B) of the UC Law states that an employer seeking to establish that an individual who has performed services for remuneration is an independent contractor must show that "(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of

---

[3] This Court's scope of review determines whether the necessary findings of fact are supported by substantial evidence, whether the Department committed an error of law, or whether constitutional rights were violated. *Victor v. Dep't of Lab. & Indus. Bureau of Tax Operations*, 647 A.2d 289, 291 n.1 (Pa. Cmwlth. 1994).

8

service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business." 43 P.S. § 753(*l*)(2)(B). The employer must establish both factors, and whether it has done so is a question of law subject to our review. *Tobey-Karg Sales Agency, Inc. v. Dep't of Lab. & Indus.*, 34 A.3d 899, 903 (Pa. Cmwlth. 2011).

## A. Applicability of the CWMA

The UC Law includes a general provision to guide in determining whether an individual is an employee or independent contractor. If, however, the services rendered involve construction, then a preliminary determination must be made as to whether the more specific CWMA applies. In enacting the CWMA, "the legislature clearly intended to combat the deceptive business practice of classifying employees as independent contractors so as to avoid the expenses and responsibilities attending the employment relationship[.]" *Dep't of Lab. & Indus. v. Workers' Comp. Appeal Bd. (Lin & E. Taste)*, 187 A.3d 914, 924 (Pa. 2018) (*Eastern Taste*).

Section 2 of the CWMA defines an "employer" for its purposes by reference to the definition of "employer" in the UC Law. *See* 43 P.S. § 933.2. The UC Law defines an "employer" broadly:

> "Employer" means the Commonwealth of Pennsylvania, its political subdivisions, and their instrumentalities and every individual, copartnership, association, corporation (domestic or foreign) or other entity . . . *who or which employed or employs any employe in employment subject to this act for some portion of a day during a calendar year*, or who or which has elected to become fully subject to this act, and whose election remains in force.

43 P.S. § 753(j)(2) (emphasis added).

9

In *Eastern Taste*, our Supreme Court considered when a business will be considered an employer for purposes of the CWMA. The Court distinguished between entities that are truly in the "construction industry" and subject to the CWMA (and, by extension, UC and workers' compensation laws) and entities that are only situationally or casually involved in the construction industry, such as, in that case, a restaurant that hired workers to perform remodeling work. The Court concluded:

> [W]hen determining whether the CWMA is applicable to the situation at hand, the construction activity must be analyzed and considered in the context of the putative employer's industry or business. Specifically, in confining its applicability to individuals who *perform services "in the construction industry,"* [Section 3 of the CWMA,] 43 P.S. § 933.3(a), the CWMA refers only to those individuals who work for a business entity that performs construction services, namely "[e]rection, reconstruction, demolition, alteration, modification, custom fabrication, building, assembling, site preparation and repair work." 43 P.S. § 933.2. Stated otherwise, the CWMA is inapplicable where the putative employer is not in the business of construction.

187 A.3d at 926 (emphasis added, some citations and quotation marks omitted). Concluding that the restaurant was not in the construction industry, the Court held that the injured worker was an independent contractor and therefore not eligible for workers' compensation benefits. *Id.*

Employer asserts that it is not in the construction industry. Employer's Br. at 13-16. Relying on *Eastern Taste*, Employer explains that, like the restaurant there, it is involved in construction work only situationally or casually, in this instance via the referrals Goldstein provides to her clients. *Id.* The Office responds that, given Goldstein's admittedly active and ongoing role in providing her clients

10

with individuals who perform construction services, Employer placed itself squarely within the construction business, such that the CWMA is applicable. Office's Br. at 18-26.

The Department's final decision did not specifically address the issue Employer raises: whether as a threshold matter, Employer is engaged in the "construction industry."[4] However, its determination that the individuals were employees pursuant to the CWMA reflects a tacit conclusion that based on the record before it, Employer is in the construction industry. Goldstein testified that Employer began as a house cleaning company, but when clients asked her if she knew anyone able to perform construction-type services in their houses such as flooring, painting, and hanging window treatments, she connected them with individuals she knew who did that kind of work.[5] R.R. at 68a & 72a. She did not accompany the individuals to the customers' homes, conduct or assist with their price estimations, or supervise the work, and she received a referral fee of about 10%-15% of the job charge, as determined and paid by the individual who did the work. *Id*. at 68a.

However, Goldstein also involved herself actively with customers by serving as a go-between for communications with the individuals doing the work, billing the customers, and receiving their payment directly, which she then paid to the individual, less her referral fee. R.R. at 72a-73a, 87a & 112a-19a. She also made the workers aware of her expectations that their work for her customers would be performed at a high level of quality, and if she got a complaint from a customer, she would call the worker and address the problem herself. *Id*. at 74a-75a & 93a-94a.

---

[4] The issue was not waived because Employer's counsel raised it in his closing statement at the hearing. R.R. at 130a.

[5] There is no dispute that the services in question fall within the ambit of the CWMA's definition of "construction." *See* 43 P.S. § 933.2.

11

She also asked the workers to let her know when a job was done so she could either take it off her "to do" list or follow up if anything might be needed. *Id*. at 123a-24a.

The foregoing record evidence supports the Department's implicit conclusion that Employer "performs services in the construction industry" such that the employment status of the workers here may be evaluated under the CWMA (see below). The putative employer in *Eastern Taste* was a restaurant and therefore obviously not in the construction industry *per se*. The construction work it hired for was a situational need so that it could perform its normal and usual services: cooking and serving food to restaurant customers. Here, by contrast, Employer "performed services in the construction industry" by actively providing its house cleaning clients with construction workers on request. Although Employer was not involved with the actual work or pricing, its level of engagement with that work was higher and more comprehensive than mere informal referrals. Depending on the customer and circumstances, Goldstein involved herself in billing, receiving customer payments, paying the individuals, and communicating with the customers on an ongoing basis, including addressing and managing customer complaints. She also expected certain quality standards for the work performed by those individuals and asked them to report to her when they finished a job so that she could clear it off her "to do" list or follow up if anything further was needed.

Employer's involvement was not as a construction customer otherwise involved in a non-construction business, like the restaurant in *Eastern Taste*. It held itself out as able to provide individuals to perform construction services, or at least was known as such by its residential customers and involved itself in the work well past the referral stage. The concerns expressed in *Eastern Taste* are not at issue here, specifically that too broad an application of the CWMA would overly burden plainly

non-construction businesses and private homeowners (like Employer's residential customers, but not like Employer itself) who hire workers for construction and renovation projects. The Department's implicit conclusion that Employer was "in the business of construction," even though it did not directly perform construction services, and that the CWMA applies in this case, was therefore supported by substantial evidence and did not constitute legal error.

## B. Application of the CWMA to Employer's Construction Workers

Having determined that the CWMA applies, we next review the Department's conclusion that the workers Employer provided to its clients for construction services were its employees for purposes of subjecting Employer to required UC contributions. The CWMA states:

> (a) General rule.--For purposes of workers' compensation, unemployment compensation and improper classification of employees provided herein, an individual who performs services in the construction industry for remuneration is an independent contractor only if:
>
>> (1) The individual has a written contract to perform such services.
>>
>> (2) The individual is free from control or direction over performance of such services both under the contract of service and in fact.
>>
>> (3) As to such services, the individual is customarily engaged in an independently established trade, occupation, profession or business.
>
> (b) Criteria.--An individual is customarily engaged in an independently established trade, occupation, profession or business with respect to services the individual performs in the commercial or residential building construction industry only if:

13

(1) The individual possesses the essential tools, equipment and other assets necessary to perform the services independent of the person for whom the services are performed.

(2) The individual's arrangement with the person for whom the services are performed is such that the individual shall realize a profit or suffer a loss as a result of performing the services.

(3) The individual performs the services through a business in which the individual has a proprietary interest.

(4) The individual maintains a business location that is separate from the location of the person for whom the services are being performed.

(5) The individual:

(i) previously performed the same or similar services for another person in accordance with paragraphs (1), (2), (3) and (4) while free from direction or control over performance of the services, both under the contract of service and in fact; or

(ii) holds himself out to other persons as available and able, and in fact is available and able, to perform the same or similar services in accordance with paragraphs (1), (2), (3) and (4) while free from direction or control over performance of the services.

(6) The individual maintains liability insurance during the term of this contract of at least $50,000.

(c) Factors not to be considered.--The failure to withhold Federal or State income taxes or pay unemployment compensation contributions or workers' compensation premiums with respect to an individual's remuneration shall not be considered in determining whether the

14

individual is an independent contractor for purposes of the Workers' Compensation Act[6] or the [UC] Law.

. . . .

(e) Unemployment compensation.--

(1) For purposes of section 4(*l*)(2)(B) of the [UC] Law, an individual is customarily engaged in an independently established trade, occupation, profession or business with respect to services the individual performs in the construction industry only if the criteria in subsection (b) are satisfied.

(2) Except as provided in paragraph (1), nothing in this act shall be construed to affect any exclusion from "employment" as defined in the [UC] Law.

43 P.S. § 933.3.  The CWMA's independent contractor criteria are "mandatory, and the absence of any one criterion will negate the independent contractor status, and the individual will be deemed an employee." *D & R Constr. v. Workers' Comp. Appeal Bd. (Suarez)*, 167 A.3d 837, 844 (Pa. Cmwlth. 2017).  As noted, there is no dispute that the individuals at issue here performed construction work at Employer's clients' homes, as defined by the CWMA.  *See* 43 P.S. § 933.2.

In the context of determining whether a worker performing construction services is an employee or an independent contractor, the CWMA adopts the general aspects of the UC Law.  *See* 43 P.S. § 933.3(e).  Therefore, the Office bore the initial burden to establish that the individuals at issue here were performing construction services for remuneration by Employer, at which point the burden would shift to Employer to establish that the individuals were independent contractors and that it was therefore exempt from UC contributions.  *A Special Touch*, 228 A.3d at 503.  As noted, employers' UC contributions are a tax and

---

[6] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

15

therefore to be construed in the employer's favor; nevertheless, the burden of disproving an individual's status as an employee is a heavy one. *Jia*, 55 A.3d at 548; *Gulf & W. Corp.*, 459 A.2d at 1371.

The Department first concluded that Employer paid 10 individuals for construction work, which Employer did not dispute. Dep't Decision at 17. The burden then shifted to Employer to establish that those individuals were independent contractors. *Id.* The Department evaluated the record evidence for each of the enumerated CWMA factors and concluded that Employer had not met that burden. *Id*. at 19-21. Employer maintains that the individuals were independent contractors outside of its direction and control, not employees. Employer's Br. at 13-16. The Office responds that Employer failed to meet its burden to show independent contractor status and that the Department correctly assigned employment status to the individuals. Office's Br. at 18-22.

The first factor of the CWMA independent contractor test requires the employer to have a written contract with the disputed individuals that reflects mutual intent to create an independent contractor relationship. 43 P.S. § 933.3(a)(1). Here, the Department correctly found that of the 10 individuals paid by Employer for construction services, Employer provided written contracts with only 3 of them, the remaining 7 were therefore still potentially employees. Dep't Decision at 19; C.R. #16.

The second factor Employer must show is that the individuals were free from control or direction over the work performed "*both* under the contract of service and in fact." 43 P.S. § 933.3(a)(2) (emphasis added). The Department concluded as fact that Employer did not control or direct any of the workers. Dep't Decision at 19; *see also* R.R. at 68a & 73a-75a. The Department noted, however, that as to the

16

seven individuals without contracts, Employer could not fully establish this point. Dep't Decision at 19-20.

The third CWMA factor required Employer to establish that the individuals were "customarily engaged in an independently established trade, occupation, profession or business." 43 P.S. § 933.3(a)(3). In turn, that determination required Employer to show that all 10 individuals met all 6 enumerated requirements listed above: ownership of their tools and equipment; the individuals would suffer a profit or loss with regard to performing the work, *i.e.*, they were not paid regular wages whether they did the work or not; they performed the work through a proprietary business; a business location separate from the location of the work performed; performed similar services for another customer and did so free of Employer's control or direction or held themselves out publicly as performing this kind of work free of Employer's direction; and maintained at least $50,000 in liability insurance. 43 P.S. § 933.3(b).

The Department concluded that Employer had not provided proof of insurance for any of the 10 individuals it paid for construction services. Dep't Decision at 20. Goldstein testified that the construction workers she provided to her clients had their own businesses and carried their own insurance, and that she required them to provide her with proof of insurance when she connected them with her clients. R.R. at 73a & 89a. Employer admitted, however, that it had not provided any insurance documentation to the Office during the audit, although it did provide other documentation such as copies of the contracts it had with certain workers. *Id.* at 94a.

The Department clearly found Goldstein's testimony alone, without documentary proof of her construction workers' insurance, insufficient to meet the

17

heavy burden of rebutting employment status in the CWMA context. We agree. In *Hawbaker v. Workers' Compensation Appeal Board (Kriner's Quality Roofing Services)*, 159 A.3d 61 (Pa. Cmwlth. 2017), this Court held that as applied to a workers' compensation claimant, who bore the burden in that context to establish employee status pursuant to the CWMA, the record included the claimant's insurance application that identified his business. *Id*. at 66. Although the claimant's insurance had lapsed at some point, the fact that he possessed it in the first place supported the finding that he was an independent contractor. *Id*. at 71.

Here, by contrast, Employer had the burden to establish independent contractor status for the 10 individuals it paid for construction services. Although Goldstein testified that these workers carried their own insurance and that she required them to provide her with certification, she admittedly did not provide that documentation to the Office during the audit process or at the hearing. R.R. at 94a. Moreover, the hearing officer stated at the close of the hearing that the record would be kept open for 40 days for the parties to resolve the status of "certain workers who may not be in dispute any longer[.]" *Id*. at 130a-31a. Employer therefore had the opportunity before, during, and after the hearing to prove that the 10 individuals at issue carried insurance, and it failed to do so.

In the CWMA context, all factors are "mandatory, and the absence of any one criterion will negate the independent contractor status, and the individual will be deemed an employee." *D & R Constr.*, 167 A.3d at 844. Given the above discussion, the Department's conclusion that Employer failed to establish all of the factors necessary to prove independent contractor status with regard to those 10 individuals was therefore supported by substantial evidence and did not constitute legal error.

18

### C. Application of the UC Law to Employer's Cleaning Workers

Because 27 of the individuals in question here were cleaning personnel not engaged in construction work for or on behalf of Employer, their employment status is analyzed under Section 4(*l*)(2)(B) of the UC Law, which requires an employer seeking to establish that an individual who has performed services for wages is an independent contractor to show that "(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business." 43 P.S. § 753(*l*)(2)(B). The employer must establish both factors, and whether it has done so is a question of law subject to our review. *Tobey-Karg Sales Agency, Inc.*, 34 A.3d at 903.

The Department concluded that Employer had established that the 27 workers it paid for cleaning services at its clients' houses were not within its control or direction in terms of the actual work performed, and the Office has not disputed that conclusion as to the first part of the test. Dep't Decision at 21-24. However, Employer was also required to establish with record evidence that the workers were "customarily engaged in an independently established trade, occupation, profession or business" as cleaners outside of their work for Employer. *Jia*, 55 A.3d at 549.

The test for this element requires consideration of three factors: "(1) whether the individuals are able to work for more than one entity; (2) whether the individuals depended on the existence of the presumed employer for ongoing work; and (3) whether the individuals were hired on a job-to-job basis and could refuse any assignment." *Minelli v. Unemployment Comp. Bd. of Rev.*, 39 A.3d 593, 596 (Pa. Cmwlth. 2012). Unlike the CWMA, the analysis is based on a totality of the

circumstances rather than a need to satisfy all three criteria. *Tobey-Karg Sales Agency, Inc.*, 34 A.3d at 908.

Whereas this test pertains largely to the nature and practical operation of an individual's outside or independent business outside of the putative employer, Section 4(*l*)(2)(B) also requires proof that the individual is actually "customarily engaged" in such a business, as opposed to performing *de minimis* outside activities on an isolated or sporadic basis: "the fact that an unemployed person agrees to accept, and thereafter does accept, an occasional offer of work is simply not enough to demonstrate that said individual is customarily engaged in an independently established trade, occupation, profession or business." *Minelli*, 39 A.3d. at 597-98 (quoting *Silver v. Unemployment Comp. Bd. of Rev.*, 34 A.3d 893, 898 (Pa. Cmwlth. 2011)). In *Minelli*, this Court explained that requiring an employer to show that an individual is customarily engaged in their own independent business is not a departure from the three-part test but is required based on the statute's express language. *Id.* at 598. Subsequently, our Supreme Court refined the analysis for determining whether an individual is "customarily engaged" in an outside independent business:

> [W]e read Subsection (4)(*l*)(2)(B) to be unambiguous in requiring a putative employer to show that an individual is actually involved in an independent trade, occupation, profession, or business in order to establish that the individual is self-employed under the second prong of Subsection (4)(*l*)(2)(B).
>
> . . . .
>
> In this respect, we agree with the Department that circumstances demonstrating that an individual is actively holding himself out to perform services for another, such as through the use of business cards or other forms of advertising, even if not actually performing those services

20

during a particular time period at issue, are also relevant to the analysis.

*A Special Touch*, 228 A.3d at 503-04. The Supreme Court has noted, however, that these cases are highly fact-intensive and that no single factor is controlling. *Id.* at 505; *see also Danielle Viktor, Ltd., v. Dep't of Lab. & Indus. Bureau of Emp. Tax Operations*, 892 A.2d 781, 791 (Pa. 2006).

Here, the Department concluded that Employer had provided some evidence to support the first and third elements of the test, primarily Goldstein's testimony that the 27 cleaning workers could and did work for other cleaning companies or clients and could refuse work offered to them by Employer. Dep't Decision at 26-27. However, the Department further concluded that Employer had not shown that the workers did not depend on Employer for ongoing work (the second element). *Id.* Relying on *Minelli*, the Department ultimately decided that, in light of Employer's evidence as a whole and the totality of the circumstances, Employer had not shown that the 27 cleaning workers at issue were independent contractors "customarily engaged" in their own cleaning businesses. *Id.* Employer notes that Goldstein's testimony on this issue was unrebutted and states: "While conceding that [Employer's] evidence was not the strongest it was more than sufficient to show that the cleaners all had their own businesses." Employer's Br. at 19-20. The Office responds that the Department's decision was correct on this issue and that Employer simply failed to meet its burden. Office's Br. at 26-27.

Goldstein testified that she got her cleaners by personal reference or word of mouth, not because she saw any advertisements from them. R.R. at 90a. She stated that to her knowledge, most of her cleaners also did cleaning work for other customers outside of her arrangements with them. *Id.* at 72a. She also knew that some cleaners would put up fliers and if they got their own potential clients,

21

they would reduce their availability for her clients. *Id*. at 91a. She did not know, however, if they advertised more formally. *Id*. at 91a & 107a-08a.

We agree with the Department that Employer's evidence (again, primarily Goldstein's testimony) established that the cleaners were able to work for other clients and could decline jobs offered to them and that Employer did not establish that her cleaners were not dependent on working for her. However, Employer also had to show that the cleaners were actually and "customarily engaged" in their own cleaning businesses. Employer was aware of this burden as of the November 2016 assessment notices and had until the November 2018 hearing and at least 40 days thereafter, during which time the hearing officer kept the record open for Employer to produce record evidence in support of its position and to meet its heavy burden. *See* R.R. at 130a-31a.

As discussed, Employer's evidence could be said to meet the three-part test to show that at least some or even most of the 27 cleaning workers at issue engaged in independent cleaning activities outside of Employer's business. However, we agree with the Department that Employer's evidence is insufficient to establish that the 27 cleaning workers were actually and "customarily engaged" in these outside pursuits. As our Supreme Court pointed out in *A Special Touch*, "Black's Law Dictionary defines the word 'customarily' to mean 'usually, habitually, according to the customs; general practice or usual order of things; regularly.'" 228 A.3d at 503 (quoting Black's Law Dictionary 385 (6th ed. 1990)). Employer's evidence establishes only that some of the cleaners at issue put out fliers at times to solicit business from other potential cleaning customers, but not that they did so usually, habitually, or regularly. We reiterate that an employer's burden to show independent contractor status and overcome the presumption of employment

22

is heavy and that Employer had several years before the hearing and 40 days after it to develop more substantial record evidence of its cleaners' outside cleaning activities than it ultimately provided. Given Employer's failure to do so, we conclude that the Department's determination that Employer failed to establish that the 27 cleaners at issue were independent contractors was supported by substantial evidence of record and did not constitute legal error.

## IV.  Conclusion

Considering the foregoing discussion, the Department's order denying Employer's petitions for reassessment of Employer's required UC contributions is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Linda's Cleaning Consultants, Inc.,     :
              Petitioner     :
        v.     :
    :
Department of Labor and Industry,     :
Office of Unemployment     :
Compensation Tax Services,     :    No. 457 C.D. 2021
              Respondent     :

## O R D E R

AND NOW, this 18th day of January 2024, the March 26, 2021, final order of the Department of Labor and Industry is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge